995 So.2d 933 (2008)
Paul H. EVANS, Appellant,
v.
STATE of Florida, Appellee.
Paul H. Evans, Petitioner,
v.
Walter A. McNeil, etc., Respondent.
Nos. SC05-1617, SC07-494.
Supreme Court of Florida.
August 28, 2008.
Rehearing Denied November 21, 2008.
*937 Neal A. Dupree, Capital Collateral Regional Counsel, Suzanne Myers Keffer, and Christina L. Spudeas, Assistant CCR Counsel, Southern Region, Fort Lauderdale, FL, for Appellant/Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, FL, for Appellee/Respondent.
PER CURIAM.
Paul H. Evans appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the following reasons, we affirm the trial court's denial and deny the habeas petition.

FACTS AND PROCEDURAL HISTORY
In the early morning hours of March 24, 1991, Alan Pfeiffer was found murdered in his trailer as a result of three gunshot wounds. After almost six years without an arrest, the police investigation ultimately led to four co-conspirators: Connie Pfeiffer, the victim's wife; Paul Evans; Sarah Thomas, Evans' girlfriend; and Donna Waddell, Thomas and Evans' roommate. The co-conspirators, with Evans as the "mastermind," collaborated on a plan to murder Pfeiffer. Evans v. State, 808 So.2d 92, 95-96 (Fla.2001).
Pursuant to the plan, Connie, Waddell and Evans went over to Pfeiffer's trailer on the morning of the murder and, among other things, placed electronic equipment close to the back door to make it look like a robbery. Evans told the others what to say and stated that he planned to hide behind the furniture and shoot Pfeiffer when he came home. Later that evening, Evans, Waddell and Thomas went to a local fair and then left the fair in order to arrive at Pfeiffer's trailer by dusk. Waddell and Thomas left Evans inside, locked the door, and went back to the fair. After approximately one to two hours, they returned to the pickup site to meet Evans and then went back to the fair to meet up with Connie. Id. at 96-97.
The next morning, the Vero Beach Police Department was called to the trailer because of complaints due to loud music. When the police arrived, the south door of the trailer was open and the victim's body was lying on the living room floor. Although there was no sign of forced entry and the victim was still wearing two gold chains and had money in his pocket, the house was in disarray. In addition, a camcorder, *938 television and VCR, which were rented from Pfeiffer's place of work, were missing from the trailer and never recovered. Id. at 97.
After six years and no arrests, the police reopened their investigation and focused on Evans, Connie, Waddell and Thomas. Thomas admitted involvement and agreed to contact Waddell while wearing a wire. Based on the cooperation of Thomas and Waddell, Connie and Evans were arrested for the murder. Id. at 98.[1]
During the guilt phase of Evans' trial,[2] the State presented the testimony of several witnesses to piece together the events of the murder. Waddell and Thomas testified about the plan and how the events on the day of the murder and the time period after unfolded.[3] One of Pfeiffer's neighbors, Leo Cordary, testified that he heard the gunshots between 8 and 8:30 p.m., but did not remember seeing anyone run from the trailer. The defense presented no witnesses during the guilt phase. The jury found Evans guilty of first-degree murder.
At the penalty phase, Evans presented the testimony of his parents and some family members who testified about his emotional and behavioral problems and his poor childhood. The defense also presented two psychology experts who testified as to his ability to do well in a structured environment. Other than the testimony of his parents and family members, the defense presented no expert testimony as to any specific mental illness or impairment. Ultimately, the jury recommended death by a vote of nine to three. The trial court found two aggravators,[4] one statutory mitigator,[5] and eleven nonstatutory mitigating circumstances.[6] The trial court concluded *939 that the aggravation outweighed the mitigation and sentenced Evans to death. Id. at 99-100. This Court affirmed the conviction and sentence on direct appeal.[7]
Evans timely filed his motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851, alleging the following six claims for relief: (I) several instances of ineffective assistance of counsel during the guilt phase and the State's withholding exculpatory and impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963);[8] (II) several instances of ineffective assistance of counsel during the penalty phase;[9] (III) ineffective assistance for failing to object to several objectionable jurors and failing to object to a limitation on backstriking; (IV) cumulative error; (V) denial of due process by rules prohibiting juror interviews to uncover constitutional error; and (VI) Evans' sentence *940 violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
At the evidentiary hearing,[10] Evans presented the testimony of several witnesses in support of the guilt and penalty-phase ineffective assistance claims, including his trial attorneys who testified as to their strategies during the guilt and penalty phases, alibi witnesses, two mental health experts, and two family members. Mark Harllee, guilt-phase counsel, testified about his strategy for deciding not to present any witnesses at trial. Harllee testified that he chose this strategy because the testimony of the potential witnesses was not credible, did not provide a complete alibi, or was too unspecific to contradict the State's evidence, and he did not want to forgo the chance to have the opening and rebuttal closing argument by presenting these witnesses. He also discussed his reasons for not striking certain jurors during voir dire and his reasons for not objecting to several comments elicited by the State. Diamond Litty, who served as Evans' penalty phase counsel and has been the Public Defender for the Nineteenth Judicial Circuit since 1992, testified about her strategy of using Evans' parents to present the mental mitigation and utilizing the mental health experts to discuss his ability to be a good inmate, which was essentially to limit the introduction of damaging evidence contained in Evans' school and medical records.
Evans also presented the testimony of several witnesses he alleges should have been called during the guilt phase, including Rosa Hightower, Jesus Cruz, Chris Evers, Mindy McCormick, and Anthony Kovaleski. As to deficiencies in the penalty phase, Evans presented the testimony of two of his aunts, Patricia Dennis and Sandy Kipp, who testified about his poor childhood and behavioral problems. Then, Evans called two new mental health experts, Dr. Seth Silverman and Dr. Philip Harvey, who discussed in detail their opinions that Evans was misdiagnosed throughout his life and that he suffers from both conduct and cognitive disorders, based on an abnormal EEG and unusual thought processes. Specifically, Dr. Silverman testified that Evans has schizoid/schizotypal personality disorder and Dr. Harvey testified that Evans suffered from "failure to thrive" disorder as an infant, which is consistent with an abnormal EEG and someone with significant discrepancy between verbal and nonverbal IQ scores.
After holding a three-day evidentiary hearing, the trial court issued a detailed order denying relief on all claims. Evans now appeals the trial court's denial of thirteen separate claims.[11] In addition, Evans *941 has filed a petition for writ of habeas corpus, raising three claims.[12]

ANALYSIS

I. MOTION FOR POSTCONVICTION RELIEF

A. Public Records Request
In his first issue on appeal, Evans asserts that his due process rights were violated when the trial court denied his motion for public records. Specifically, Evans sought the disclosure of a letter from Assistant State Attorney Lawrence Mirman sent to Diamond Litty and Mark Harllee, defense counsel from Evans' trial, which purportedly contained responses to areas of questioning to be asked by postconviction counsel at the evidentiary hearing. Based on our decision in Kearse v. State, 969 So.2d 976 (Fla.2007), we affirm the trial court's denial.
In Kearse, the assistant state attorney sent the defendant's trial counsel, who was listed as both a State and defense witness at the evidentiary hearing, a letter in anticipation of the attorney's testimony. The letter contained the state attorney's "mental impressions" about the case and about the ineffective assistance claims that were raised in Kearse's postconviction motion. Id. at 988-89. The trial court conducted an in-camera examination and ruled that, given the nature of the letter and the fact that counsel was listed as a witness for both parties, the letter was attorney work product exempt from disclosure. See id. at 988. We held that the letter "clearly fits within the exemption of attorney work product prepared with regard to the ongoing postconviction proceedings" and affirmed the trial court's decision. Id. at 989.
Contrary to Evans' contention that the letter went beyond mere witness preparation, the State is correct that the letter contains nothing more than the state attorney's impressions of the pending litigation. As in Kearse, the letter here was written by an agency attorney, contained his mental impressions about the claims raised in the postconviction motion, and was produced exclusively for the pending evidentiary hearing as contemplated in section 119.071(1)(d)1, Florida Statutes (2007).[13] *942 969 So.2d at 989. Accordingly, we affirm the trial court's denial.

B. Ineffective Assistance of Counsel
Evans next raises several ineffective of counsel claims. Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla. 2004).

1. Ineffective Assistance at Voir Dire
Evans next contends that counsel provided ineffective assistance during voir dire by failing to object when the trial court limited his right to back strike unqualified members of the panel and by allowing two unqualified jurors, Schumann and Combs, to sit on the panel. As to the issue of back striking, the trial court conducted further voir dire to fill a vacancy on the panel and gave each side additional peremptories to do so. Defense counsel asked whether the parties could back strike and the judge, although initially indicating that he wanted to complete jury selection, confirmed that he would not prohibit the defense from further back striking. The record indicates that the judge was frustrated and wanted to complete jury selection; however, competent, substantial evidence supports the trial court's finding that the judge never enforced such a prohibition and counsel therefore cannot be deficient for failing to object.
Evans also asserts that counsel was ineffective for failing to challenge juror Schumann for cause or take advantage of back striking to remove her from the jury because of her views on the death penalty. Although juror Schumann clearly supported the death penalty and initially indicated that a case of self-defense would be the only time she would recommend life, she immediately confirmed that she would listen to the judge's instructions, "consider all circumstances" and follow the law. Based on her clear confirmation of her ability to follow the law and counsel's belief that she would be a good guilt-phase juror, counsel's decision not to challenge juror Schumann was reasonable and a matter of trial strategy. See Dufour v. State, 905 So.2d 42, 54-55 (Fla.2005); cf. Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995) (concluding that counsel's decision not to strike a juror who appeared *943 biased as to guilt but favorable as to the sentence was reasonable).
Evans' last assertion in this claim is that counsel was ineffective for failing to reassert his challenge for cause against juror Combs or use a peremptory challenge to remove him from the jury when Combs stated that he knew two potential witnesses. However, even if counsel was deficient in failing to object based upon juror Combs' potential bias, we conclude that Evans cannot demonstrate prejudice because neither of the identified witnesses testified during the trial. Accordingly, we affirm the trial court's denial of this claim.

2. Failure to Present Evidence
Evans asserts that the trial court erred in denying his claim that counsel provided ineffective assistance by failing to present certain evidence. Evans first asserts that counsel was ineffective for failing to present the testimony of Cruz, Magia, and Lynch, who could have contradicted the State's purported timing of the murder. At the evidentiary hearing, Evans did not call Magia, but presented the testimony of Cruz, who testified that he lived with Magia at the time, that they were both extremely drunk that night, and that he has no recollection of looking at his watch that evening, but believes he heard the gunshots around 9:30 or 10 p.m. Cruz also stated that he broke his neck in an accident in 1997, which was between the night of the murder and the trial in 1999, and has had a memory lapse ever since. Trial counsel clearly had tactical reasons for not calling Magia or Cruz to testify, including the fact that both had questionable credibility and were admittedly drunk on the night of the murder, and Cruz had a memory lapse about when he heard the gunshots; thus, counsel's decision not to present their testimony does not constitute ineffective assistance. See Whitfield v. State, 923 So.2d 375, 381 (Fla. 2005) (holding counsel not deficient for deciding, after considering alternatives, not to present witnesses who were neither good historians nor articulate).
William Lynch, who passed away before the evidentiary hearing, originally gave a statement to the police that he heard gunshots around 10:30 p.m. However, counsel testified that he conducted background research attempting to find Lynch and would have considered presenting his testimony had he located him. In fact, counsel filed a motion to quash the indictment for undue delay based in part on an inability to locate witnesses such as Lynch. Because it is clear from the record that counsel made reasonable attempts to locate Lynch but was unable to find him, Evans cannot establish that counsel was ineffective for failing to call him at trial. See White v. State, 964 So.2d 1278, 1286 (Fla.2007) ("A defendant cannot establish ineffective assistance of counsel based on counsel's failure to call a witness who is unavailable.").
Evans also asserts that counsel was ineffective for failing to present the testimony of three alibi witnesses, Rosa Hightower, Anthony Kovaleski, and Christopher Evers. Counsel testified that he investigated Hightower because she had originally informed the defense investigator that she was with Evans at the fair sometime between 6 and 7 p.m., but she later told him that she was not with Evans the entire time at the fair and did not remember seeing him again that night. Counsel also investigated Kovaleski, who said he saw Evans at the fair near dusk and that he walked around with him for about an hour. However, counsel testified that sunset was at 6:34 p.m., which meant that if Kovaleski and Evans met at dusk or sometime around 6 p.m., it would have left enough time for Evans to leave the *944 fair to reach Pfeiffer's trailer. Because the testimony of both witnesses, as known to Harllee at the time of trial, offered an incomplete alibi and counsel made a strategic decision not to present their testimony, counsel's performance was not deficient. See Reed v. State, 875 So.2d 415, 429-30 (Fla.2004) (rejecting ineffective assistance claim where alibi defense is not complete).[14]
Evans also contends that counsel was deficient for failing to present the testimony of Evers, Connie Pfeiffer's twelve-year-old son who was at the fair with her on the night of the murder. Evans asserts that counsel should have interviewed Evers as an alibi witness because he stated that he saw Evans at the fair around 8 p.m. and for impeachment purposes because his testimony that Waddell drove him home at 8 p.m. contradicted her testimony at trial. However, Evers admitted that he had no reason to be watching the clock that evening, that he was not really sure about the timing, and that there was a substantial amount of time at the fair that he was neither with Waddell nor with Evans. Counsel's failure to interview this single witness, Connie's twelve-year old son, does not render his entire investigation and representation deficient. This is especially so where the only information that might have led counsel to interview Evers was a single fingerprint alleged to have been found in Pfeiffer's trailer,[15] which would neither have established an alibi defense for Evans nor contradicted Waddell's testimony concerning the events of that night.
The last witness that Evans asserts should have been presented is Mindy McCormick, a friend of Connie's who saw electronic items in Connie's storage facility shortly after the murder and witnessed an unidentified man give Connie a manila envelope. However, Evans cannot demonstrate that counsel was deficient on these grounds. As to the electronic items in Connie's storage facility, counsel testified at the evidentiary hearing that he remembers questioning McCormick at the pretrial deposition about the items she saw in the storage facility, but did not investigate further or present her testimony because she was unable to identify the items with any specificity. Counsel is correct that without a more specific identification of the items she saw, it is difficult to ascertain whether these unidentified items were even relevant to the murder. Because her testimony would not have directly contradicted Thomas and Waddell's testimony that before the murder Connie had given Evans similar electronic items as partial payment for the murder, counsel's decision not to present her testimony was strategic and that decision is not unreasonable or outside the realm of professional norms. *945 See Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000).
As to McCormick's testimony about the package and the description of the man she had given to the police, counsel testified that he did not recall being told about this information, but that he would have investigated further had he known. Conversely, McCormick testified at the evidentiary hearing that she informed defense counsel during a deposition that she had given a taped statement to the police, described the unidentified man who had given Connie the package, and even went with the police to Pfeiffer's electronics store to identify the items she saw in the storage facility. However, without introducing the deposition into the record, which would enable the Court to determine whether counsel was aware of this information, Evans cannot demonstrate that counsel was deficient for failing to investigate further. See, e.g., Freeman v. State, 761 So.2d 1055, 1062 (Fla.2000) (stating that it is defendant's burden to establish both prongs of Strickland).
In sum, counsel clearly made an informed decision about not presenting any witnesses during the guilt phase, which is exactly what he told the judge at the guilt phase: "After a year-and-a-half of consultation, followed by the last few minutes here, we're going to rest...." Because the trial court's findings are supported by competent substantial evidence and counsel's decision not to present these witnesses was reasonable, we affirm the trial court's denial.[16] Because counsel's failure to present these witnesses was not deficient, we do not address the prejudice prong of Strickland. Nixon v. State, 932 So.2d 1009, 1018 (Fla.2006).

3. Failing to Object to a Juror's Participation in the Trial
Evans asserts that his counsel provided ineffective assistance at the guilt phase by failing to object to juror Taylor's participation in the trial. Evans argues that juror Taylor interjected herself into the trial as an unsworn witness to answer a question concerning a traffic light that was of particular importance to the defense's theory, namely, that it was impossible for Evans to have traveled the distances in the allotted time as asserted by the State. Although counsel did not remember whether he heard juror Taylor make the comment or about which intersection she was speaking, he recalled the judge reminding her that jurors were not allowed to participate in the trial. He decided not to further object or request an additional inquiry into whether any members of the panel were improperly influenced because she was a good defense *946 juror, counsel believed the judge cured any possible error with the comment by instructing the juror not to participate in the trial, and he knew that she was the alternate and therefore any extrinsic information that she may have had was unlikely to reach the deliberation room. Based on this testimony, we agree that counsel strategically decided not to object to a juror's single comment, where the juror was admonished by the trial judge and the comment appears to have had minimal relevance in relation to the trial as a whole, because he believed she was a good defense juror. Because "strategic decisions do not constitute ineffective assistance" and counsel's decision here is reasonable considering the circumstances, counsel cannot be deficient for failing to further object. See Occhicone, 768 So.2d at 1048.

4. Failing to Timely Request a Richardson Hearing
In his next claim, Evans argues that counsel was ineffective for failing to timely request a Richardson[17] hearing, object to the trial court's denial of a full inquiry, and seek sanctions against the State after Charles Cannon, Pfeiffer's next-door neighbor, changed his testimony at the third trial. The State asserts that Evans' claim is without merit because counsel timely requested a Richardson hearing and the trial court simply denied the request on the merits because the State's conversation with Cannon about the possibility of forgetting parts of his testimony did not qualify as discoverable evidence under the rules. The postconviction court denied this claim because Evans failed to demonstrate deficiency and prejudice where the record indicated that no discovery violation had occurred. We affirm the denial because the trial record completely refutes this claim.

5. Failing to Object to Prejudicial Comments Elicited by the State
Evans argues that counsel was ineffective for failing to object to several improper comments elicited by the State, including testimony from Thomas that she was sixteen or seventeen at the time of the crime and later became pregnant with Evans' child and testimony from Waddell that Evans was in a gang. Evans also asserts that counsel failed to object to the State's comment during closing arguments that the murder was "execution-style."
As to the testimony that Thomas was sixteen or seventeen years old at the time of the crime and later became pregnant with Evans' child, the trial court concluded that counsel made a strategic decision not to object. At the evidentiary hearing, counsel testified that he decided not to object to this testimony because it comported with the defense's strategy that Thomas had a motivation to lie and was information that would not be viewed negatively as it is "commonplace now, and ... pretty well accepted by society." Additionally, he believed the prosecutor could simply have asked Thomas her age and the jury could clearly see how old she was when she testified. We agree with the trial court that neither deficiency nor prejudice has been demonstrated.
Evans next asserts that counsel was deficient for failing to request a Richardson hearing and waiving a motion for mistrial by accepting a curative instruction concerning Waddell's comment that Evans was in a gang.[18] Although *947 counsel never requested a Richardson hearing based upon the State's failure to inform the defense about this testimony, the colloquy that followed his objection to the remark and motion for a mistrial confirms that the State was unaware of this information and did not willfully withhold it from the defense or otherwise violate a discovery rule that would have required a Richardson hearing. Because counsel took immediate action to rectify the improper testimony and there was no basis to conclude that the State violated a discovery rule, counsel's decision to move for a mistrial rather than request a Richardson hearing was reasonable "under the norms of professional conduct." Occhicone, 768 So.2d at 1048.[19]
Evans also claims that counsel was deficient for failing to object to the State's comment during closing argument that the murder was "execution-style." This Court has previously held that a murder involving a gunshot to the head can be classified as an "execution-style" killing. See Ford v. State, 802 So.2d 1121, 1133 (Fla.2001). Here, evidence was presented that Pfeiffer was shot three times, once in the back and twice in the head, at a distance of at least two feet. Because the facts in evidence support the inference that this was an "execution-style" murder and the prosecutor's comment was therefore not improper, counsel cannot be deemed ineffective for failing to object. See Rogers v. State, 957 So.2d 538, 549 (Fla.2007).[20] Thus, we affirm the trial court's denial.

6. Failing to Object to Improper Bolstering
Evans argues that counsel was ineffective for failing to object to several statements elicited by the State and to comments during the State's closing argument that improperly bolstered the State's witnesses. *948 First, Evans contends that counsel should have objected to statements by Detective Cook regarding his investigation and his conversations with Thomas. However, the record confirms that the comments elicited from Detective Cook during direct examination occurred in close proximity to each other and counsel objected five times during this period, ultimately moving for a mistrial based on improper bolstering. Similarly, when Detective Cook confirmed on cross-examination that Thomas was not arrested and commented that "the Grand Jury made that final decision," counsel immediately requested a sidebar conference and the court issued a curative instruction directing the witness to answer the question as posed without any additional comment.[21] We agree with the trial court that counsel's assistance was neither deficient nor outside the norms of professional conduct. See Occhicone, 768 So.2d at 1048.
Second, Evans argues that counsel was ineffective for failing to object during the State's closing argument, in which the prosecutor discounted the defense's theory because Waddell pled to second-degree murder. However, Thomas and Waddell were both accomplices to the crime and witnesses at the trial; therefore, the State was permitted to discuss Thomas's incriminating statements and Waddell's plea agreement, which were valid impeachment tactics used by the defense while cross-examining both of these witnesses. See Bell v. State, 965 So.2d 48, 56 (Fla.2007) (citing Bruton v. United States, 391 U.S. 123, 137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and Parker v. State, 458 So.2d 750, 753 (Fla.1984)). Because the prosecutor's statement during closing argument was a legitimate comment on the evidence presented at trial and proper rebuttal to the defense's closing argument, counsel cannot be ineffective for failing to object. See id. at 57.

7. Failing to Object to State's Closing Argument Concerning Mutually Exclusive Factual Theories of Prosecution
Evans argues that counsel was ineffective for failing to object during the State's guilt-phase closing argument when the prosecutor told the jury that they could find Evans guilty of first-degree murder as a principal or as the shooter and that this decision need not be unanimous on this point.[22] The trial court denied the claim based on Evans' failure to demonstrate prejudice.[23]
*949 This Court has never specifically decided whether a jury must unanimously find a defendant guilty under either a principal or shooter theory or whether the jury may be split between the two. Because this Court has neither prohibited the State from arguing to jurors that they can be split on the principal or shooter factual theories nor required the use of special verdict forms in such situations, counsel's failure to object to this comment cannot be deemed deficient performance. See Occhicone, 768 So.2d at 1048. Based on counsel's multiple attempts to prevent the State from proceeding under dual theories and considering his perspective at the time given this Court's precedent, we affirm the trial court's denial.

8. Failing to Present Mitigation Evidence
In this issue, Evans argues that the trial court erred in denying his claim that counsel failed to present expert testimony concerning his mental and emotional deficiencies, interview witnesses other than his parents regarding his childhood, or have additional tests conducted to ascertain whether he suffered from organic brain damage. The trial court denied this claim, finding that counsel was not deficient because he made informed decisions after conducting a thorough evaluation and strategically decided to present testimony through lay witnesses. Because Evans cannot demonstrate that counsel's failure to present additional mitigation evidence resulted in prejudice, we affirm the trial court's denial.
At the evidentiary hearing, Evans presented additional lay witnesses and two experts to support this ineffective assistance claim. Two of Evans' aunts testified about his poor childhood, his ADHD, and the drugs he was taking for his hyperactive behavior. However, such evidence would have been cumulative to the testimony of his parents, who testified at the penalty phase about these issues.[24]See Barnhill v. State, 971 So.2d 106, 116 (Fla. 2007) (concluding that counsel cannot be ineffective for failing to present cumulative evidence).
Evans also presented the testimony of two mental health experts.[25] Dr. Silverman testified that Evans had unusual thought processes, which were consistent with a thinking or personality disorder as opposed to a conduct or behavioral disorder. Dr. Silverman acknowledged that Evans was diagnosed on numerous occasions with conduct disorder and that his impulse behaviors were consistent with that diagnosis, but believed the conduct was merely a symptom of the underlying problemunusual thought processes. He stated that Evans had an abnormal EEG test, which is consistent with frontal lobe *950 problems and the possibility of brain damage. Dr. Silverman diagnosed Evans, albeit just two days before the evidentiary hearing, with schizoid-type personality disorder.
Dr. Harvey also testified at the evidentiary hearing and diagnosed Evans with a "significant profile of current cognitive impairments... consistent with a profile that's seen in children who have failure to thrive," a disorder that was briefly discussed in some of his records. Dr. Harvey testified that Evans' striking deficit between his verbal and performance IQ scores and his abnormal EEG are consistent with infants who suffer from "failure to thrive," which often causes neurological impairments and abnormal brain development. On cross-examination, Dr. Harvey admitted that his diagnosis may be somewhat inconsistent, both with the fact that Evans lived for almost eight years after the murder without being arrested and the testimony of Waddell and Thomas that Evans was the mastermind behind the plan to murder Pfeiffer. However, Dr. Harvey noted that Evans was on social security disability for psychological issues at the time of the murder and that he was skeptical about testimony that Evans planned the murder because it came from two codefendants.
Despite the fact that Evans has now found more favorable experts to testify to additional mitigation, our confidence in the outcome is not undermined because the testimony adduced at the evidentiary hearing may not have supported any of the statutory mitigators. Neither expert testified at the evidentiary hearing that Evans was in fact suffering from extreme mental or emotional disturbance at the time of the crime. Although one expert testified that Evans' cognitive impairments were detectable at a young age and "are very likely to have been operative at the point in time of his crime," this does not appear to contain the specificity that is required to support statutory mitigation. See Jones v. State, 949 So.2d 1021, 1030 (Fla.2006) (rejecting claim of ineffective assistance of penaltyphase counsel where defendant failed to present expert evidence that he was suffering from any cognitive impairment at the time of the crime that would have supported any statutory mental health mitigation, other than expert testimony that "he thought both of the statutory mental health mitigators applied").
Further, the trial court gave moderate weight to nonstatutory mitigation based on Evans' cognitive impairments, including a difficult childhood (little weight), that Evans suffered great trauma during childhood (moderate weight), and that he suffered from hyperactivity and a history of hospitalization for mental illness (moderate weight), notwithstanding the fact that expert testimony was limited on that issue at the penalty phase. Thus, although Evans asserts that the testimony of Dr. Harvey and Dr. Silverman would have supported additional nonstatutory mitigation, the trial court had already given moderate weight to his cognitive impairments as nonstatutory mitigation without this expert testimony and found it insufficient to outweigh two weighty aggravators, pecuniary gain and CCP, which were assigned "great weight" by the trial court. We therefore deny relief on this claim.

D. Brady Violation
Evans next asserts that the trial court erred in denying his claim that the State withheld material exculpatory and impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Evans argues that the State withheld the following evidence: (1) information that the State's key witness, Leo Cordary, received a benefit for his testimony; (2) two letters *951 detailing Waddell's psychological instability at the time of the crime and Evans' trial; and (3) a taped statement of McCormick, in which she explained that an unidentified man gave Connie a heavy manila envelope several weeks after the murder and how Connie discarded the envelope into a river to get rid of "old memories," and a description she had given police of the unidentified man.
When a defendant alleges a Brady violation, they must prove the following: "(1) the State possessed evidence favorable to the accused because it was either exculpatory or impeaching; (2) the State willfully or inadvertently suppressed the evidence; and (3) the defendant was prejudiced." Allen v. State, 854 So.2d 1255, 1259 (Fla.2003). Evans first argues that the State withheld evidence that Leo Cordary, one of the State's witnesses, received a benefit for testifying in Evans' trial, namely, that he was arrested for violating his probation two days before Evans' third trial and that the State arranged for a bond hearing as a benefit to him for his testimony. Although this Court has previously held that evidence that a witness is receiving a benefit for testifying could be subject to a Brady challenge, see Guzman v. State, 868 So.2d 498, 508 (Fla.2003), the prosecutor in this case testified that both the conversation she had with Cordary's attorney and the bond hearing itself did not occur until after Cordary testified in February 1999. Because the decision on the bond reduction was not made until after Cordary testified and he was thus unaware of the benefit he was receiving, there is no "favorable" or impeachment evidence. Therefore, Evans fails to meet the first prong of Brady.
Second, Evans asserts that the State withheld two letters indicating that Waddell was mentally unstable.[26] Although it was his burden to prove that the State withheld this information, Evans never questioned either prosecutor at the evidentiary hearing to ascertain whether they knew about Waddell's mental status at the time of the trial. Further, one letter was clearly not yet in existence, as it was dated several months after Evans' trial, and Evans cannot establish when the other letter was written. Because Evans cannot demonstrate that either of the letters was in existence at the time of his trial, there can be no Brady violation.
Third, Evans argues that the State withheld exculpatory evidence that McCormick had given a taped statement to the police, in which she described an unidentified man who gave Connie a manila envelope several weeks after the murder, and gave the police sufficient information to create a composite sketch that could have indicated another suspect. However, Evans failed to demonstrate that the unidentified man and the contents of the package were exculpatory because the incident occurred several weeks after the murder and may not have been relevant to the case, and McCormick confirmed at the evidentiary hearing that she still had no specific details about the incident. Thus, the information was neither exculpatory nor impeachment evidence subject to Brady and we deny relief on this issue.

*952 E. Rules Prohibiting Juror Interviews
Evans next asserts that Rule Regulating the Florida Bar 4-3.5(d)(4) is unconstitutional because it denies him the right to effective assistance of counsel in pursuing postconviction relief by preventing the defense from interviewing jurors for possible misconduct.[27] However, this Court has repeatedly rejected challenges to the constitutionality of rule 4-3.5(d)(4). See, e.g., Barnhill, 971 So.2d at 116-17. Furthermore, where the defendant merely complains about the "inability to conduct `fishing expedition' interviews," the claim is without merit. Johnson v. State, 804 So.2d 1218, 1225 (Fla.2001) (quoting Arbelaez v. State, 775 So.2d 909, 920 (Fla. 2000)). Here, although Evans asserts that juror Taylor commented during a witness's testimony about a light at an intersection, Evans presented no sworn allegations that the juror's comment "fundamental[ly] and prejudicial[ly] ... vitiate[d] the entire proceedings." Power v. State, 886 So.2d 952, 957 (Fla.2004). Without more substantial allegations of how juror Taylor's single "yes or no" response prejudiced the entire proceeding, this appears to be a "fishing expedition" after a guilty verdict has been returned. See Arbelaez, 775 So.2d at 920. Thus, we affirm the trial court's summary denial.

F. Ring Claim
Evans next asserts that Florida's death sentencing statute is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).[28] However, this Court and the United States Supreme Court have held that Ring does not apply retroactively. Schriro v. Summerlin, 542 U.S. 348, 358, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) ("Ring announced a new procedural rule that does not apply retroactively to cases already final on direct review."); Franqui v. State, 965 So.2d 22, 36 (Fla.2007). In Johnson v. State, 904 So.2d 400 (Fla.2005), which was the seminal Florida decision on the issue of the retroactivity of Ring, we held that a death sentence becomes final for purposes of Ring once the Court has affirmed the conviction and sentence on direct appeal and issued the mandate. Id. at 407. Thus, Evans' death sentence became final after this Court both affirmed on direct appeal and issued the mandate in February 2002. Because Ring was not decided until June 2002, Evans cannot rely on it to vacate his death sentence.

E. Cumulative Error
Evans argues that the trial court conducted an improper cumulative analysis in this case because the errors involved deprived him of a fundamentally fair trial. However, we affirm the denial of Evans' cumulative error claim because there is no individual error in any of his claims. See Griffin v. State, 866 So.2d 1, 22 (Fla.2003) ("Because the alleged individual errors are without merit, the contention of cumulative error is similarly without merit....").

*953 II. PETITION FOR WRIT OF HABEAS CORPUS

A. Ineffective Assistance of Appellate Counsel
Consistent with Strickland, granting habeas relief based on ineffectiveness of appellate counsel
is limited to those situations where the petitioner establishes first, that appellate counsel's performance was deficient because "the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance" and second, that the petitioner was prejudiced because appellate counsel's deficiency "compromised the appellate process to such a degree as to undermine confidence in the correctness of the result."
Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000) (quoting Thompson v. State, 759 So.2d 650, 660 (Fla.2000)). Counsel is not ineffective for failing to raise an issue on direct appeal that "would in all probability have been found to be without merit." Id. (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)).
Evans first contends that appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred in denying his motion for a mistrial and request for a Richardson hearing after witness Cannon testified that he did not remember whether he saw Pfeiffer's TransAm outside the trailer when he arrived home. Evans argues that the trial court should have granted either the motion for a mistrial or the request for a Richardson hearing because Cannon had discussed the possibility of his lack of memory with the State prior to the third trial and the State improperly allowed the defense to argue in its opening statement that Cannon would testify that he did not see the TransAm that night.
This Court applies an abuse of discretion standard to both denials of a motion for a mistrial, see England v. State, 940 So.2d 389, 402 (Fla.2006), and to denials of a request for a Richardson hearing. See Conde v. State, 860 So.2d 930, 958 (Fla.2003). Here, the trial court was well within its discretion to deny the motion for a mistrial and the request for a Richardson hearing because Cannon's testimony had not changed in any material way. When he spoke to the police immediately after the incident, Cannon said that he was "trying to think" if he remembered seeing the TransAm. Then, about seven years later, Cannon gave a deposition that completely contradicted both his first statement to the police and his testimony from the first trial, stating that the TransAm was parked outside the trailer. Subsequently, at Evans' first trial, Cannon said that he did not remember seeing the TransAm that night. Lastly, at the retrial, Cannon testified that he did not remember if he saw the TransAm. As noted by the trial court, Cannon's consistently equivocal statements evidence an individual who could not exactly remember what he saw that night, even when asked in close proximity to the murder. Thus, the trial court was within its discretion in denying the motion for a mistrial and Richardson inquiry because no discovery violation occurred and appellate counsel cannot be deficient for failing to raise the issue on direct appeal.
Evans also asserts that appellate counsel was ineffective for failing to challenge on direct appeal the trial court's denial of a motion for a mistrial based upon Waddell's testimony that Evans was *954 in a gang.[29] However, the claim would likely have been found to be without merit even if it had been raised on direct appeal because this Court has previously held that a trial court did not abuse its discretion in similar circumstances. See, e.g., Mendoza v. State, 964 So.2d 121, 130-31 (Fla.2007) (holding that trial court did not abuse its discretion in denying motion for mistrial because it gave a curative instruction following an improper comment on the jury's responsibility). Because Evans cannot demonstrate that the trial court abused its discretion in denying the motion, appellate counsel cannot be ineffective for failing to raise the meritless issue on direct appeal.

B. Cruel and Unusual Punishment Under Atkins and Roper

Lastly, Evans contends that his death sentence is unconstitutional under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). However, Evans was never diagnosed as mentally retarded and, in fact, the record reflects that he has previously received verbal and performance IQ scores of 91 and 110, respectively. Thus, Evans is not entitled to relief under Atkins. See Hill v. State, 921 So.2d 579, 584 (Fla.2006). Further, this Court has consistently held that Roper only prohibits the execution of defendants "whose chronological age is below eighteen" at the time of the capital crime. Id. Because Evans was nineteen at the time of the crime, his death sentence cannot be unconstitutional under Roper. Accordingly, this claim is without merit.

CONCLUSION
For the reasons explained above, we affirm the denial of Evans' motion for postconviction relief and deny his habeas petition.
It is so ordered.
QUINCE, C.J., and WELLS, ANSTEAD, PARIENTE, LEWIS, CANTERO, and BELL, JJ., concur.
NOTES
[1] Connie was prosecuted and convicted of first-degree murder and received a life sentence. Id. at 96 n. 1. Waddell agreed to plead guilty to second-degree murder in exchange for providing a sworn statement and testifying on behalf of the State. Id. at 95. Thomas agreed to testify on behalf of the State and was never charged for her involvement in this murder. Id.
[2] Evans' first trial resulted in a hung jury and the judge declared a mistrial during voir dire during his second trial. Evans was finally convicted at his third trial, which is the subject of his postconviction motion at issue in this case.
[3] Waddell and Thomas were not in agreement about certain circumstances surrounding the murder. Although both witnesses agreed that they eventually met Evans at the prearranged site, Waddell testified that they immediately picked him up, whereas Thomas testified that they drove around for a while, parked in a gravel parking lot, went back to the fair for another 30 to 45 minutes, and then picked up Evans. Id. at 96-97, 97 n. 3. Additionally, as to when the gun was discarded,

Thomas stated that she and Evans disposed of the gun a few days after the murder in a canal so that fingerprints would be hard to find. By contrast, Waddell testified that the three of them disposed of the gun in a canal that night after shooting off the rest of the bullets. Moreover, according to Waddell, after they disposed of the gun, they went to a dirt road where Evans changed clothes and discarded the dark colored shirt and his shoes. He kept the dark colored pants.
Id. at 97 n. 4. They also gave conflicting testimony about when Evans burned his pants following the murder. However, the testimony confirmed that the camcorder and television that were allegedly given to Evans as payment were destroyed after the murder.
[4] The trial court found the following: (1) the murder was committed for pecuniary gain (great weight); and (2) the murder was committed in a cold, calculated, and premeditated manner ("CCP") (great weight). Id. at 99.
[5] The trial court found that Evans was nineteen when he committed the murder (little weight). Id.
[6] "The trial court found and gave weight to the following nonstatutory mitigators: (1) Evans' good conduct while in jail (little weight); (2) Evans' good attitude and conduct while awaiting trial (little weight); (3) Evans' difficult childhood (little weight); (4) Evans was raised without a father (little weight); (5) Evans was the product of a broken home (little weight); (6) Evans suffered great trauma during childhood (moderate weight); (7) Evans suffered from hyperactivity and had a prior psychiatric history and a history of hospitalization for mental illness (moderate weight); (8) Evans was the father of two young girls (very little weight); (9) Evans believes in God (very little weight); (10) Evans will adjust well to life in prison and is unlikely to be a danger to others while serving a life sentence (very little weight); (11) Evans loves his family and Evans' family loves him (very little weight). The trial court found that Evans failed to establish that he was immature, and therefore gave this proposed mitigator no weight. Moreover, the court refused to recognize Evans' artistic ability as a mitigating circumstance and therefore gave this no weight." Id. at 99.
[7] Evans raised the following claims on direct appeal: "(1) the trial court erred in denying Evans' motion to quash the indictment or dismiss the charge; (2) reversal is required under Anderson v. State, 574 So.2d 87 (Fla. 1991), because the State's testimony at trial contradicted the case it presented to the grand jury; (3) the trial court erred in excluding the testimony concerning cannabanoids in the victim's blood; (4) the trial court erred in limiting the cross-examination of Detective Brumley to exclude hearsay; (5) the trial court erred in closing individual voir dire to Evans' family; (6) the trial court erred in denying Evans' motion for a statement of particulars and in allowing the State to argue in the alternative that Evans was the shooter or a principal; (7) the State's closing argument comments during the guilt phase were reversible error; (8) the State's voir dire examination of the jury regarding the testimony of coconspirators or codefendants constituted fundamental error; (9) Evans' death sentence is disproportionate; (10) Evans' death sentence is either disproportionate or unconstitutional because the State presented the jury with the alternative theories that Evans was either the shooter or a principal; (11) the State's closing argument comments during the penalty phase were fundamental error; (12) the trial court erred in giving no weight to valid mitigation; (13) the trial court erred in imposing the death penalty when the jury made no unanimous findings of fact as to death eligibility [under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)]; (14) the trial court erred in finding that the murder was both cold, calculated, and premeditated and that the murder was committed for pecuniary gain (improper doubling)." Id. at 100 n. 8.
[8] Evans alleged the following ineffective assistance of counsel claims: (1) failing to object to an individual juror's participation in trial; (2) failing to timely request a hearing pursuant to Richardson v. State, 246 So.2d 771 (Fla. 1971); (3) failing to object to inflammatory and prejudicial comments elicited by the State; (4) failing to object to improper bolstering of witness credibility; (5) failing to object during the State's closing argument regarding mutually exclusive factual theories of prosecution; and (6) failing to present evidence.
[9] Evans alleged the following ineffective assistance of counsel claims during the penalty phase: (1) failing to present mitigation; and (2) failing to object to serious misstatements of the law, including that the jury's role was merely advisory and that the burden of proof rested with Evans to prove that mitigation outweighed aggravation.
[10] Evans was granted an evidentiary hearing on all claims except his claim that counsel was ineffective during the penalty phase for failing to object to serious misstatements of law.
[11] Evans has appealed the denial of the following claims: (1) denial of access to public records, whereby the State withheld material impeachment evidence; (2) guilt-phase ineffective assistance for failing to present evidence; (3) guilt-phase ineffective assistance for failing to object to an individual juror's participation in the trial; (4) guilt-phase ineffective assistance for failing to timely request a Richardson hearing; (5) guilt-phase ineffective assistance for failing to object to inflammatory and prejudicial comments elicited by the State; (6) guilt-phase ineffective assistance for failing to object to improper bolstering of witness credibility; (7) guilt-phase ineffective assistance for failing to object to State's closing argument regarding mutually exclusive factual theories of prosecution; (8) the State withheld material exculpatory or impeachment evidence; (9) penalty-phase ineffective assistance for failing to present mitigation evidence; (10) ineffective assistance of counsel at voir dire, for failing to challenge an objectionable juror for cause, failing to reassert his challenge for cause against another unqualified juror, and failing to object to the court limiting his ability to backstrike members of the panel; (11) the trial court failed to conduct an adequate cumulative error analysis; (12) due process violation because the rules prohibit Evans from interviewing jurors to determine if constitutional error was present during deliberations; and (13) Evans' sentence violates Ring.
[12] Evans raises the following claims: (1) ineffective assistance of appellate counsel for failing to raise meritorious issues on direct appeal, including the denial of Evans' motion for a mistrial and request for a Richardson hearing based on Brady and discovery violations, and the denial of Evans' motion for a mistrial and Richardson hearing when the State's witness improperly and without prior notice testified as to the character of Evans; (2) Evans' sentence of death constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution because of his mental impairments and his age at the time of the crime; and (3) Florida's capital sentencing procedure deprived Evans of due process rights to notice and a jury trial under Ring and Apprendi.
[13] Section 119.071(1)(d) exempts the following records from disclosure:

A public record that was prepared by an agency attorney ... or prepared at the attorney's express direction, that reflects a mental impression, conclusion, litigation strategy, or legal theory of the attorney or the agency, and that was prepared exclusively for civil or criminal litigation or for adversarial administrative proceedings, or that was prepared in anticipation of imminent civil or criminal litigation or imminent adversarial administrative proceedings....
[14] Counsel's decision was also reasonable because presenting Kovaleski would have opened the door to damaging testimony on cross-examination. Kovaleksi had been convicted of several felony offenses involving crimes of dishonesty, his demeanor rendered him not credible, and he had previously allowed his wife to have sex with Evans in front of him.
[15] Although Evans questioned counsel about his failure to interview Evers, specifically citing the fact that he was listed as a source of a fingerprint inside of Pfeiffer's trailer, the record does not confirm that Evers' fingerprint was actually lifted from the trailer. In fact, detective Allan Elliot testified at trial that several prints were lifted from the trailer, but he was unsure whether a print on a glass inside the trailer was identified as Evers' or whether it was just a small child or petite person. Moreover, counsel's failure to investigate Evers based on a single fingerprint found in the victim's trailer, which happened to belong to his mother's husband, should not render his assistance deficient.
[16] Counsel also testified that he did not believe that any of these witnesses, who had credibility or other problems associated with their testimony, was worth giving up the "sandwich," i.e., losing the opportunity to give two closing arguments at the guilt phase. See Van Poyck v. State, 694 So.2d 686, 697 (Fla. 1997) (concluding that there were tactical reasons for limiting the presentation of evidence that might indicate another person was the triggerman, such as losing the opportunity to give two closing arguments at the guilt phase); accord Reed, 875 So.2d at 430. The Legislature has since enacted section 918.19, Florida Statutes (2007), which provides that the State shall have opening and rebuttal closing arguments. In addition, this Court amended Florida Rule of Criminal Procedure 3.250 and adopted Florida Rule of Criminal Procedure 3.381, confirming that the State is entitled to opening and rebuttal closing arguments even if the defense presents no evidence at trial. In re Amendments to the Florida Rules of Criminal Procedure Final Arguments, 957 So.2d 1164, 1166-67 (Fla.2007). However, when Evans was prosecuted in 1999, the defense was permitted to have both the opening and rebuttal closing arguments if it presented no evidence; thus, counsel's decision to take this into consideration was reasonable at that time.
[17] Richardson v. State, 246 So.2d 771 (Fla. 1971).
[18] During direct examination of Donna Waddell, she testified that Evans threatened her after the murder and told her not to tell the police anything because "you'll lose your child and the old family will kill you." Defense counsel immediately approached the bench and asked for a mistrial based upon this reference to Evans' membership in a gang, which was denied. Defense counsel then renewed his motion and requested a curative instruction, which was read to the jury as follows: "All right. Members of the Jury, there is no evidence that the Defendant was in a gang. That was pure speculation on the part of Ms. Waddell. The Jury should disregard that statement in its entirety."
[19] As to counsel's failure to preserve the motion for a mistrial for appellate review, this claim is without merit. Counsel preserved the issue by both immediately moving for a mistrial and then renewing the motion after the attempt to proffer Waddell's testimony was deemed insufficient to cure the problem. See Card v. State, 803 So.2d 613, 620-21 (Fla.2001) (finding an issue preserved for review where counsel objected and moved for a mistrial, even though the trial court denied the motion and issued a curative instruction). This Court has held that counsel need not request a curative instruction to preserve an issue for review once they have timely objected and moved for a mistrial. See Kearse v. State, 770 So.2d 1119, 1129 (Fla.2000) (concluding that counsel "need not request a curative instruction in order to preserve an improper comment issue for appeal," where counsel objects or moves for a mistrial); James v. State, 695 So.2d 1229, 1234 (Fla. 1997). Accordingly, the trial court correctly concluded that this claim is without merit because counsel preserved the issue for review.
[20] Although Evans asserts that counsel was also deficient for failing to object because the "execution-style" remark could be used to support the CCP aggravator, the trial court supported its CCP finding by describing in detail all of the calculated and premeditated actions that Evans took in murdering Pfeiffer, including that he deliberately planned the murder, attempted to make it look like a robbery, hid in Pfeiffer's trailer, waited for him to arrive, and then shot him in the back once and in the head twice. Thus, the trial court based its finding of the CCP aggravator on more than the mere fact that the murder was "execution-style."
[21] After Cook's comment, defense counsel immediately requested a sidebar:

MR. HARLLEE: I know he's trying to help, Judge, but he keeps throwing in these little comments after almost every single response. The Jury should not have heard that last statement that Sarah Thomas is not indicted by the Grand Jury.
MS. ROBINSON: He asked the question.
THE COURT: I think that came out during opening statements, I believe. But I agree. I've tried to hold him back, but what I'll do is just instruct him to answer the question and not offer any information.
[22] Evans also asserts that counsel was deficient for failing to object to the State's comment during closing argument that if the jury believed that Evans had an alibi, then he was guilty as a principal. However, the record confirms that the State's comment was proper in the context of the dual theories it presented to the jury. Specifically, the State presented evidence that Evans not only planned the murder but also was the shooter. Therefore, if the jury believed that Evans had an alibi for the time period during the crime, there was still sufficient evidence of his liability as a principal for the jury to find him guilty. Accordingly, this assertion is refuted by the record and without merit.
[23] The trial court noted that Evans raised this issue on direct appeal, but this Court never addressed the merits because the claim was unpreserved. See Evans, 808 So.2d at 106. To the extent that Evans now argues that this Court's decision on direct appeal stands for the proposition that due process rights are violated under the United States Supreme Court's decisions in Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), and Richardson v. United States, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), when a jury's decision on whether the defendant was the principal or the shooter is not unanimous, that argument is without merit. This Court's rejection of a claim as unpreserved is not a statement that the claim would have had merit if it had been preserved.
[24] Evans' parents testified about his poor childhood, his ADHD and the drugs he was taking, his hospitalizations and institutionalizations due to his behavioral problems, how he dealt with his parents' divorce, and the difficulty Evans had in dealing with the traumatic incident in which he accidentally shot his younger brother.
[25] At the penalty phase, two mental health experts, Dr. Landrum and Dr. Levine, testified about the psychological testing they performed, Evans' high to superior intelligence, his artistic ability, and his ability to respond well to a structured environment.
[26] The first was a handwritten letter from Waddell to Judge Hawley, which was received on July 12, 1999, in which she described the mental issues she was enduring at the time of the murder and pleaded for leniency in her sentence. The second was a letter from Waddell's counsel to Maria Lawson, in which counsel described the mental issues that Waddell was experiencing at the time of the murder and noted that he would be seeking a sentence below the guidelines.
[27] Rule 4-3.5(d)(4) states: "A lawyer shall not ... after dismissal of the jury in a case with which the lawyer is connected, initiate communication with or cause another to initiate communication with any juror regarding the trial except to determine whether the verdict may be subject to legal challenge; provided, a lawyer may not interview jurors for this purpose unless the lawyer has reason to believe that grounds for such challenge may exist; and provided further, before conducting any such interview the lawyer must file in the cause a notice of intention to interview setting forth the name of the juror ... to be interviewed."
[28] Evans raised a similar claim in his habeas petition so we address both issues here.
[29] Evans also argues that appellate counsel should have challenged the trial court's failure to hold a Richardson hearing without a request by defense counsel. However, this Court has repeatedly held that counsel is not ineffective for failing to raise errors that were not preserved "and do not present a question of fundamental error." Valle v. Moore, 837 So.2d 905, 907-08 (Fla.2002). As previously mentioned, the record confirms that the State was equally surprised by Waddell's comment, did not willfully withhold it from the defense, and did not otherwise violate a discovery rule that would have required a Richardson hearing. Because Evans fails to demonstrate any trial court error, much less one that is fundamental, appellate counsel was not ineffective on this basis. Id.