# Supreme Court of Florida

_____

No. SC14-2225
_____

**DONTE JERMAINE HALL,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC15-859
_____

**DONTE JERMAINE HALL,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[June 15, 2017]

PER CURIAM.

Donte Jermaine Hall appeals the denial of his postconviction motion filed

under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ

of habeas corpus.  As explained below, we affirm the denial of his postconviction

guilt phase claims, deny his habeas guilt phase claims, but vacate his death

sentence, and remand for a new penalty phase.[1]

## I. BACKGROUND

Hall was convicted and sentenced to death for the 2006 murder of Anthony

Bernard Blunt. On direct appeal, this Court described the background of this case

as follows:

> The evidence at trial revealed that on September 8, 2006, 22-year-old Hall learned that his girlfriend, 18-year-old Angel Glenn, had been hired to dance and strip at a house party that night. Angel had been told she would make a lot of money for dancing, and Hall told Angel that he planned to rob the attendees of the party. Hall, along with his twin brother, Dante, and acquaintances Shoo-Shoo and Pig, followed Angel and her two fellow dancers from Orlando to the party in Eustis. At the party, several men were present, drinking alcohol, smoking marijuana, and using ecstasy. The girls entered the house, went into a back room, took ecstasy pills, and began changing clothes. Hall stayed in communication with Angel via cell phone while she was in the room, asking her how many men were in the house, whether there were guns in the house, and when the party would begin. After some delay, music began playing and the girls began dancing and stripping.
>
> Within approximately five or ten minutes, Hall entered the house, carrying an assault rifle and saying he was going to "make this choppa dance." Hall was followed by Dante, Shoo-Shoo, and Pig, and all four men were wearing dark clothing and had their faces partially covered. They were carrying handguns and assault rifles. The attendees of the party, as well as the three dancers, gathered in the living room.
>
> The intruders started shooting, and the lights went out. The gunmen demanded money and told the partygoers to get down on the

---

1. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. Because we remand for a new penalty phase, we do not address Hall's penalty phase claims.

ground, and the partygoers began taking off their jewelry and handing it to the gunmen. The seized items included gold chains, bracelets, watches, and a Gucci bag containing about $1500 in cash.

Eyewitness testimony established that Hall was the first to fire a gun and that Hall did most of the talking. In order to stop the shooting and distract the gunmen, partygoer Keson Evans stated that there was a box of money in the back room. Hall went to the back room but found the door locked; he returned to the living room and fired his gun again, fatally shooting Evans in the head.

The four gunmen were in the house for ten minutes or less. During that time, Willie "Jay" Shelton, William Robinson, Joshua Daniel, Keson Evans, and Anthony Blunt were each shot. Daniel was the first to be shot, and he suffered several gunshot wounds to his hands, thighs, abdomen, and torso. Later, after being rushed to the hospital, Daniel spent eighteen hours in surgery to remove the bullets and treat his approximately twenty entrance and exit wounds, which were very severe but ultimately nonfatal. Shelton was shot once in the stomach and once in the forearm. His injuries caused him to be hospitalized for two years. Robinson was shot in the stomach and in the shoulder. Blunt was fatally shot in his chest, right thigh, and left hand. Evans was shot in the face and the right thigh and died as a result.

The gunmen fled the house immediately after Evans was shot. The three women then left the house together with Angel driving them back to Orlando. Hall called Angel, asking her whether the women were okay and telling them to calm down. Hall and Angel arranged to meet at a gas station on a major road leading from Eustis back to Orlando. At the gas station, Hall got out of Dante's car and into Angel's car, carrying a gun and stolen property from the robbery. During the car ride, Hall stated that he was angry because he did not get enough money and the robbery did not go as he had planned. Angel dropped Hall off at his mother's house, where he was living at the time.

The next morning, Angel went to Hall's mother's house to see him at his request. Twin brother Dante and Hall's mother were also home. Dante was pulling jewelry from the robbery out of a Gucci bag, and the twins discussed what they would do with the jewelry, how much it was worth, and how they would make money off of it. Hall gave some of the jewelry to Dante's girlfriend and instructed her to pawn it. Some of the robbery victims later identified jewelry that

had been pawned, and Angel identified the same jewelry as jewelry she had seen in Hall's possession at his mother's house the day after the robbery.

The following day, Dante went to the hotel where Hall, Angel, and Angel's one-year-old son were staying and discussed with Hall the logistics of pawning the jewelry from the robbery. The twin brothers left the hotel together with most of the jewelry. Hall also gave Angel a few of pieces of jewelry to pawn, for which she received $1,000 that she then gave to Hall. Over the next several days, Hall made phone calls to Shoo-Shoo and Pig to discuss the jewelry and how the proceeds would be divided.

Angel was soon arrested for pawning the stolen jewelry and was in jail for several weeks, during which time she lied to police about the events of September 9 because she was frightened for her family's wellbeing. Meanwhile, one of the other dancers from the party, Nikita Jackson, told police what had happened the night of the robbery and murders. Eventually, Angel also admitted to the police what had happened and agreed to testify against Hall.

During the penalty phase, the court received expert testimony regarding Hall's mental health. Two psychologists testified that Hall was of very low intelligence with an IQ in the borderline range of intellectual abilities. Both psychologists also testified that Hall had some history of substance abuse.

Using special verdict forms, the jury voted unanimously that three aggravating circumstances were established beyond a reasonable doubt for the murders of Anthony Blunt and Keson Evans: (1) that Hall had a prior violent felony conviction; (2) that he knowingly created a great risk of death to many people; and (3) the murders were committed for pecuniary gain. Additionally, the jury voted eleven to one that the murder of Anthony Blunt was especially heinous, atrocious or cruel.[N1] The jury voted eight to four in favor of a death sentence for the murder of Blunt and recommended a life sentence for the murder of Evans.

N1. The State had not sought the heinous, atrocious, or cruel aggravator in regard to the murder of Keson Evans.

After conducting a Spencer [v. State, 691 So. 2d 1062 (Fla. 1996)] hearing, the trial court followed the jury's recommendation of death for the murder of Anthony Blunt, concluding that the four

- 4 -

aggravating factors outweighed several mitigating factors. Specifically, the trial court found the following aggravators for Blunt's murder: (1) Hall was contemporaneously convicted of armed burglary, armed robbery, attempted felony murder of Willie Shelton, attempted felony murder of Joshua Daniel, and first-degree murder of Keson Evans (some weight); (2) Hall created a great risk of death to many people (great weight); (3) Hall committed the murder for pecuniary gain (great weight); and (4) Hall committed the murder of Blunt in an especially heinous, atrocious, or cruel manner (great weight). The trial court found one statutory mitigating circumstance: Hall's capacity to conform his conduct to the requirements of the law was substantially impaired (some weight). The court also found the following nonstatutory mitigating circumstances: (1) Hall demonstrated appropriate courtroom behavior (minimal weight); (2) Hall's family background included generational drug and alcohol use (some weight); (3) Hall's family background included generational criminal behavior (some weight); (4) Hall did not grow up with good role models (some weight); (5) Hall grew up in a dangerous neighborhood that reinforced drug use (some weight); (6) Hall may have been abused as a child (minimal weight); (7) Hall had many different living arrangements as a child (minimal weight); (8) Hall suffered from attention deficit disorder and is considered borderline mentally retarded (some weight); and (9) Hall has an extensive history of drug and alcohol abuse (minimal weight).

Hall v. State, 87 So. 3d 667, 669-71 (Fla. 2012) (footnote omitted).

On October 16, 2013, Hall filed a motion for postconviction relief. Hall appeals the denial of that motion and also petitions this Court for a writ of habeas corpus.

## II. ANALYSIS

### A. Ineffective Assistance of Trial Counsel

Hall argues that trial counsel was ineffective for failing to object to the introduction of evidence of uncharged offenses. Specifically, Hall contends that

the State's witness, Glenn, stated that Hall and others "do this kind of stuff," and this was a reference that Hall commits robbery or murder on a regular basis and trial counsel should have objected to that testimony. Hall also takes issue with statements made during the State's closing argument, also allegedly referring to uncharged crimes. However, this Court affirms the trial court's denial of relief.

Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), this Court explained that two requirements must be met for ineffective assistance of counsel claims to be successful:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Bolin v. State, 41 So. 3d 151, 155 (Fla. 2010) (quoting Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986)).

Regarding the deficiency prong of Strickland, there is a strong presumption that trial counsel's performance was not ineffective. Strickland, 466 U.S. at 690. Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. Further, the defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged

action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

Regarding the prejudice prong of Strickland, "the defendant must show that there is a reasonable probability that, 'absent the [deficient performance], the factfinder would have [had] a reasonable doubt respecting guilt.' " Dennis v. State, 109 So. 3d 680, 690 (Fla. 2012)) (quoting Strickland, 466 U.S. at 695). "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.' " Henry v. State, 948 So. 2d 609, 617 (Fla. 2006) (quoting Strickland, 466 U.S. at 694).

"Because both prongs of Strickland present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the trial court's factual findings that are supported by competent, substantial evidence, but reviewing the trial court's legal conclusions de novo." Dennis, 109 So. 3d at 690.

In this case, Hall has not demonstrated that counsel was deficient. Trial counsel testified at the evidentiary hearing that he made a reasonable strategic decision to not object during Glenn's testimony and the cited portion of the State's closing argument. Specifically, trial counsel explained that he made a decision not to object because he did not want to bring this issue to the jury's attention. Additionally, trial counsel explained during his testimony that "[Glenn] didn't reference other uncharged robberies[, s]he wasn't that specific and [trial counsel]

didn't want her to get any more specific than she was." Choosing not to object and draw the jury's attention to this area of the testimony was not outside the "broad range of reasonably competent performance under prevailing professional standards." Bolin, 41 So. 3d at 155 (quoting Maxwell, 490 So. 2d at 932). Therefore, Hall has failed to demonstrate deficiency.

Additionally, Hall has not demonstrated prejudice. The challenged phrases "do this kind of stuff" and "why do you do this" do not clearly reference uncharged crimes as Hall contends. As the trial court concluded, "Glenn's testimony on this issue was not a feature of the trial nor was it a clear indication that [Hall] had committed any collateral offenses." In the context of the testimony, these statements could also simply be referring to the actual incident and criminal acts that are the subject of that proceeding. Also, the record demonstrates that the State did not question or elicit testimony from Glenn regarding uncharged crimes, and during closing argument, the State did not allude to or argue any uncharged crimes or propensity towards criminal activity. Further, as trial counsel understood it and as the trial court noted, "Glenn spoke in a colloquial dialect[,] her testimony did not have verb-tense agreement, [and] she tended to mix up verbs and words." Therefore, there is not "a reasonable probability that, 'absent the [remarks], the factfinder would have [had] a reasonable doubt respecting guilt.' " Dennis, 109

So. 3d at 690 (quoting Strickland, 466 U.S. at 695). In other words, our confidence in the outcome is not undermined. See id.

Accordingly, because Hall has failed to establish deficiency and prejudice, we affirm the trial court's denial of this claim.

## B. Ineffective Assistance of Appellate Counsel & Cumulative Error

In his habeas petition, Hall argues that appellate counsel was ineffective for failing to raise a claim involving the introduction of evidence of uncharged crimes on direct appeal. However, this claim is repetitive of the guilt phase issue raised in his appeal of his postconviction motion and is procedurally barred. See Hardwick v. Dugger, 648 So. 2d 100, 105 (Fla. 1994) ("[H]abeas corpus petitions are not to be used for additional appeals on questions which could have been, should have been, or were raised on appeal or in a rule 3.850 motion, or on matters that were not objected to at trial." (quoting Parker v. Dugger, 550 So. 2d 459, 460 (Fla. 1989))). Moreover, for the reasons explained above, this claim is without merit, and appellate counsel cannot be deemed ineffective for failing to raise this non-meritorious claims on direct appeal. See Rutherford v. Moore, 774 So. 2d 637, 643 (Fla. 2000). Therefore, we deny relief.

Additionally, in the appeal of the denial of his postconviction motion as well as in his habeas petition, Hall claims that he was denied a fundamentally fair trial based on cumulative error. "However, where the individual claims of error alleged

are either procedurally barred or without merit, the claim of cumulative error also necessarily fails." Israel v. State, 985 So. 2d 510, 520 (Fla. 2008) (citing Parker v. State, 904 So. 2d 370, 380 (Fla. 2005)). Therefore, we affirm the summary denial of this claim and also deny habeas relief.

## C. **Hurst**

Finally, we consider whether Hall is entitled to relief after the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016). Because the jury recommended the death penalty by a vote of eight to four, we conclude that Hall's death sentence violates Hurst. See Kopsho v. State, 209 So. 3d 568, 570 (Fla. 2017). We must then consider whether the Hurst error was harmless beyond a reasonable doubt:

> The harmless error test, as set forth in Chapman[v. California, 386 U.S. 18 (1967),] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.

Hurst v. State, 202 So. 3d 40, 68 (Fla. 2016) (quoting State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986)), cert. denied, No. 16-998 (U.S. May 22, 2017).

Because the jury in this case recommended death by a vote of eight to four, "we cannot determine that the jury unanimously found that the aggravators outweighed the mitigation." Kopsho, 209 So. 3d at 570. "We can only determine that the jury did not unanimously recommend a sentence of death." Id. Therefore,

- 10 -

because we cannot say that there is no possibility that the error did not contribute to the sentence, the error in Hall's sentencing was not harmless beyond a reasonable doubt.

Accordingly, we vacate the death sentence and remand for a new penalty phase. See Hurst, 202 So. 3d at 69.

## III. CONCLUSION

For the foregoing reasons, we affirm the denial of Hall's postconviction guilt phase claims, deny his guilt phase habeas claims, vacate his death sentence, and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
LAWSON, J., concurs specially with an opinion.
POLSTON, J., concurs in part and dissents in part with an opinion, in which CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LAWSON, J., concurring specially.

See Okafor v. State, No. SC15-2136, slip op. at 15 (Fla. June 8, 2017) (Lawson, J., concurring specially).

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death sentence pursuant to Hurst.

CANADY, J., concurs.

An Appeal from the Circuit Court in and for Lake County,
        Don F. Briggs, Chief Judge - Case No. 352006CF002795BXXXXX
And an Original Proceeding – Habeas Corpus

Ali Andrew Shakoor, Assistant Capital Collateral Regional Counsel, Middle
Region, Temple Terrace, Florida,

        for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Tayo Popoola,
Assistant Attorney General, Daytona Beach, Florida,

        for Appellee/Respondent